CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
MAY 03 2011
BY: JULIA C. DUDLEY, CLERK
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

| | |
|---|---|
| PROTHERAPY ASSOCIATES, LLC<br>*Plaintiff,*<br><br>v.<br><br>AFS OF BASTIAN, INC. d/b/a/ Bland County Nursing and Rehab Center, *et al.*<br>*Defendants.* | CIVIL ACTION NO. 6:10-CV-17<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

Plaintiff brought this action seeking to hold Defendants jointly and severally liable for liquidated and compensatory damages arising out of the alleged breach of nine substantially identical contracts. On July 10, 2010, I ordered the parties to submit the compensatory damages claim to arbitration; however, the liquidated damages claim remains before the court. Now pending are cross motions for summary judgment on the liquidated damages claim (docket nos. 59 and 61). For the reasons given herein, I conclude that Plaintiff is entitled to summary judgment as to nine of the ten Defendants. However, I will withhold entering an award pending further briefing on the appropriateness of joint and several liability.

I.

Plaintiff is a citizen of Florida and Missouri, and Defendants are citizens of Arizona, Delaware, Nevada, Texas, and Virginia. Because there is complete diversity, and the amount in controversy exceeds $75,000, the court has jurisdiction over the matter pursuant to 28 U.S.C. § 1332. In accordance with a forum selection clause contained in each of the contracts at issue, the court must apply Florida law.

1

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to preclude summary judgment, the dispute about a material fact must be "'genuine,' that is . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). In considering summary judgment motions, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). Where, as here, the court faces cross motions for summary judgment, it must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

Plaintiff ProTherapy Associates, LLC ("ProTherapy") provides physical and occupational therapy and speech/language pathology services to "skilled nursing facilities," known colloquially as nursing homes. Defendants include nine such facilities: AFS of Bastian, Inc. d/b/a/ Bland County Nursing and Rehab Center; AFS of Fincastle, Inc. d/b/a Brian Center Nursing Care of Fincastle; AFS of Low Moor, Inc. d/b/a Brian Center Nursing Center of Alleghany; Cane Island Care Center, L.P.; Amity Fellowserve of Hondo, Inc. d/b/a/ Hondo Healthcare and Rehabilitation; AFS of Lebanon, Inc. d/b/a Maple Grove Rehabilitation and Health Care Center; AFS of Yuma, Inc. d/b/a Palm View Rehabilitation and Care Center; AFS of Hot Springs, Inc. d/b/a The Springs Nursing Center; and Amity Fellowserve of Katy, Inc. d/b/a/ Katyville Healthcare Center (collectively, "Facilities"). The tenth defendant, Amity

Fellowserve, Inc. d/b/a Kissito Healthcare ("Kissito"), operates the facilities and negotiated the contracts in issue, but is not a named party to any of the contracts.

Beginning in May 2008, ProTherapy entered agreements with the Facilities to provide, supervise, and train appropriately licensed therapy personnel. Upon Defendants' request for a rate reduction in or around August 2009, the Facilities and ProTherapy entered into nine substantially identical Therapy Services Agreements ("Agreements"). Each Agreement included a restrictive covenant forbidding the Facilities from "directly or indirectly" soliciting or hiring ProTherapy employees, as follows:

> **10. Non-Solicitation.** During the term of this Agreement and for one year thereafter, [Facility] shall not, directly or indirectly, for [Facility] or on behalf of any other person or business entity for the benefit of [Facility]: (a) solicit, recruit, entice or persuade any Therapists or other employees of [ProTherapy] who had contact with [Facility] pursuant to this Agreement to become employees or contractors of [Facility] responsible for providing services to Patients like the Services hereunder; or (b) employ or use as an independent contractor any individual who was employed or utilized as a contractor by [ProTherapy] for the provision of Services at any time during the twelve (12) months prior to such proposed employment or contracting. Recognizing that compensatory monetary damages resulting from a breach of this section would be difficult to prove, [Facility] agrees that such breach will render it liable to [ProTherapy] for liquidated damages in the amount of ten thousand dollars ($10,000) for each such individual. Exempt from this provision are therapists who were full time employees of [Facility] on June 30, 2008.

Weeks after entering the Agreements, the Facilities terminated their relationship with ProTherapy, and engaged third party Reliant Pro Rehab, L.L.C. ("Reliant") as their new therapy services provider.[1] Then, acting through Reliant, the Facilities indirectly hired fifty-seven former ProTherapy employees. Accordingly, Plaintiff seeks to recover $10,000 per employee in liquidated damages.

---

[1] Each Agreement contained a termination provision allowing either party to terminate the Agreement upon 90 days' notice. ProTherapy has waived any rights it may have had arising out of the termination of the Agreements.

3

## II.

Four principal issues must be resolved: the liability of Kissito; the sufficiency of the factual basis of the alleged breach; the validity of the restrictive covenant, generally; and the validity of the liquidated damages provision, in particular.

### A.

Plaintiff has not articulated a theory under which Kissito might be held liable for the breach of contract claim. Kissito was not a party to any of the Agreements, and while it negotiated on behalf of the Facilities, and allegedly "controlled and operated" the Facilities, this is not sufficient. With the exception of Cane Island Care Center, L.P, all of the Defendants are corporations. As the corporate form is generally intended "to limit liability and serve a business convenience . . . [c]ourts are reluctant to pierce the corporate veil and only in exceptional cases will they do so." *State ex rel. Cont'l Distilling Sales Co. v. Vocelle*, 27 So. 2d 728, 729 (Fla. 1946).

> A party seeking to pierce the corporate veil and hold a parent corporation liable for the actions of its subsidiary must prove: (1) that the subsidiary was a mere instrumentality of the parent, *and* (2) that the parent engaged in improper conduct through its organization or use of the subsidiary. Improper conduct is present only in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose ... or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose.

*Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1320 (11th Cir. 1998) (quotations omitted). Therefore, to the extent that Plaintiff seeks to hold Kissito liable as a parent corporation, it has not made the requisite showing. Moreover, while there may be a theory under which Kissito is liable for the actions of Cane Island Care Center, L.P., a Texas limited partnership, Plaintiff has introduced no evidence or argument to that effect.

Nor may Kissito be held liable as an agent for the Facilities. "[A]n agent acting within the course and scope of its agency relationship with a disclosed principal is not liable for the

debts or obligations of the principal arising from contracts which the agent may negotiate or execute on behalf of such disclosed principal." *Sussman v. First Fin. Title Co. of Fla.*, 793 So. 2d 1066, 1068 (Fla. Dist. Ct. App. 2001). "[I]f the contracting party knows the identity of the principal for whom the agent purports to act, the principal is deemed to be disclosed." *Van D. Costas, Inc. v. Rosenberg*, 432 So. 2d 656, 659 (Fla. Dist. Ct. App. 1983). It follows that Kissito's role as negotiator for the Facilities is not sufficient to render it liable for the Facilities' breach of contract.

Therefore, I will grant summary judgment in favor of Kissito.

### B.

There is no genuine dispute that numerous individuals who worked at ProTherapy began working with Reliant, at the Facilities, as providers of therapy services, within the time limitation imposed by the restrictive covenant. The evidence to that effect consists of the following: (1) "ProTherapy's final therapist time sheets," which establish a termination date for each Agreement; (2) ProTherapy and Reliant payroll records, which indicate employment dates for the majority of the contested employees; (3) other documentary sources, which show the remainder of the employment dates; and, (4) a verified list of Reliant employees and independent contractors providing therapy services at the Facilities. Pls. Br. Exs. 4, 8-16. Cross referencing all of the above evidence, and excluding exempt employees, Plaintiff concludes that at least fifty-seven individuals meet all of the criteria of the restrictive covenant. Pls. Br. Ex. 7. Defendants have raised no genuine challenge to the accuracy of any of the above discussed evidence.[2]

---

[2] Defendants submit that "Reliant has produced records informing Plaintiff that it has no record of employment or hours worked by 19 employees claimed to have been hired in breach of the non-solicitation clauses." However, upon review of the records, it is apparent that Defendants' objection is without merit. None of the 19 individuals identified are the subject of ProTherapy's claims.

Instead, Defendants argue that there is no evidence that they solicited employees. While the matter may be fairly debated, it need not be addressed because clause (b) of the restrictive covenant contains no solicitation requirement. Defendants argue that a knowledge or solicitation requirement must be read into the clause, lest the court ignore the intent of the parties "to prevent the Facilities from taking the outside therapy personnel and bringing them back in-house," and "curb or punish conduct that is wholly outside the control of [Defendants]." However, Defendants' reading would effectively strike the word "indirectly" from the contract, and render clause (a), with its attendant solicitation requirement, superfluous. It is hornbook law that "[a]ll the various provisions of a contract must be so construed . . . as to give effect to each." *Univ. of Miami v. Frank*, 920 So. 2d 81, 87 (Fla. Dist. Ct. App. 2006) (quotation omitted). Furthermore, the plain meaning of the provision is to the contrary, and "[a]bsent an ambiguity, the actual language used in the contract is the best evidence of the intent of the parties . . . ." *Gibney v. Pillifant*, 32 So. 3d 784, 785 (Fla. Dist. Ct. App. 2010) (quotations omitted). Finally, Reliant's conduct was not "wholly outside" of Defendants' control. Although Defendants' contract with Reliant purportedly "does not supply the Facilities with any control or objection over the specific therapists to be provided," this is not Plaintiff's responsibility. Defendants could easily have forbidden Reliant from retaining prohibited personnel, or secured indemnity from Reliant for any improper hiring.

Defendants also contend that *J.K.R. Inc. v. Triple Check Tax Service., Inc.*, 736 So. 2d 43, 44 (Fla. Dist. Ct. App. 1999) requires the court to conclude that the restrictive covenant does not apply to therapists who actively sought employment with Reliant. But as *Triple Check* involved a contract the express terms of which applied only to cases of solicitation, it is inapposite here. Furthermore, the law does not require limitation of such provisions to cases of active solicitation.

6

*See Envt'l Servs., Inc. v. Carter*, 9 So. 3d 1258, 1266 (Fla. Dist. Ct. App. 2009). Accordingly, there is a sufficient factual basis to support Plaintiff's summary judgment claim against the Facilities.

### C.

Florida law generally prohibits contracts in restraint of trade. Fla. Stat. § 542.18. Therefore, a party seeking to enforce a restrictive covenant has the burden to "plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant" and "that the contractually specified restraint is reasonably necessary to protect the legitimate business interest or interests justifying the restriction." Fla. Stat. §§ 542.335(1)(b),(c). After the party seeking enforcement presents a *prima facie* case, the burden shifts to the opposing party to show that "the contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interest . . . ." Fla. Stat. § 542.335(1)(c). In such cases, the court must "modify the restraint and grant only the relief reasonably necessary to protect such interest or interests." *Id.* In addition, the court must "construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement." Fla. Stat. § 542.335(1)(h).[3]

Legitimate business interests include, but are not limited to, "[s]ubstantial relationships with specific . . . existing customers;" "[c]ustomer . . . goodwill associated with . . . [a] specific geographic location;" and, "[e]xtraordinary or specialized training." Fla. Stat. §§

---

[3] Plaintiff argues that *Miller v. Williams*, 300 So. 2d 752 (Fla. Dist. Ct. App. 1974) suggests that the statutory framework is inapposite where, as here, the Plaintiff does not seek injunctive relief. In *Miller*, the court held that an accountant's agreement to share fees with his former firm for a period of years was "not a restriction but simply a business arrangement incident to the continued practice of the parties . . . ." 300 So. 2d at 755. However, *Miller* involved application of Florida Statutes § 542.12, later renumbered § 542.33, which is inapplicable to contracts entered after July 1, 1996. See Fla. Stat. § 542.331. Moreover, Florida Statutes § 542.335, which applies in this case, expressly contemplates that a court may enforce a restrictive covenant by means other than injunctive relief. See Fla. Stat. § 542.335(1)(j). Furthermore, it is easy to conceive of a fee arrangement that imposed a burden so great that it is tantamount to an outright prohibition of trade. Accordingly, I decline to follow *Miller*, and conclude that the instant case must be analyzed under the statutory framework.

7

542.335(1)(b)(3)-(5). ProTherapy's amended complaint pleads that the restrictive covenant was reasonably necessary to achieve each of the above three legitimate business interests.

1.

Plaintiff successfully presents a *prima facie* case that the restrictive covenant was reasonably necessary to further its legitimate business interests in customer relationships and customer goodwill associated with a particular geographic location. Fla. Stat. §§ 542.335(1)(b)(3)-(4). ProTherapy's Patricia Wike testified, by affidavit, that many of the Facilities are located in rural areas, where it is difficult to identify and recruit therapy personnel. She further indicated that ProTherapy's employees worked at the Facilities, and developed relationships with Facility residents and staff. Moreover, ProTherapy "specifically trained its personnel to follow Defendants' favored practices and procedures," in particular to set daily "resource utilization group" levels for Facility residents. Wike also testified that "relationships that therapy personnel develop with employees and residents of skilled nursing facilities are vital considerations when a skilled nursing facility determines whether or not to renew a therapy services contract."

Defendants have provided no facts to contradict any of this testimony, and it it is evident that Defendants attached significant value to ProTherapy's employees. Following termination of the Agreements, Kissito's Chief Financial Officer Mike Yates wrote ProTherapy expressing a desire "to retain all eligible staff" and to have the "opportunity to speak with any other employees, managers, or executives . . . for whom you may grant us the right to do so." Kissito also coordinated with ProTherapy to allow Reliant human resources personnel to visit the Facilities during the transition from ProTherapy to Reliant.

In *Continental Group, Inc. v. KW Property Management, LLC*, 622 F. Supp. 2d 1357 (S.D. Fla. 2009), which involved competitors in the condominium property management business, the court found that the plaintiff had a legitimate business interest in preventing the "loss of goodwill of clients by having [plaintiff's] on-site property managers switch to [defendant]." It explained that "[p]roperty managers . . . develop positive relationships with the governing boards of the condominium, a critical consideration when these governing boards vote to extend or terminate a management contract." *Id.* at 1375. As in *Continental Group*, the employees at issue are on-site representatives of the plaintiff, who had developed substantial relationships with individuals at a client site. There, as here, it is evident that those relationships were of significant value to all concerned.

Defendants argue that *Continental Group* is distinguishable because the goodwill in this case is associated not with some third party, but with the Facilities themselves. A plaintiff seeking to enforce a restrictive covenant must "demonstrate that the defendant has misappropriated . . . *identifiable* assets" of the business, *Univ. of Fla. v. Sanal*, 837 So. 2d 512, 516 (Fla. Dist. Ct. App. 2003) (emphasis in original). Defendants contend that ProTherapy cannot make such a showing because any goodwill interest that Plaintiff had in the Facilities was destroyed upon termination of the Agreements. However, a defendant cannot claim the absence of a legitimate business interest where it has destroyed that interest by violating the restrictive covenant. *See* Fla. Stat. § 542.335(1)(g)(2). As discussed in part C(3) below, the termination of the Agreements, the Facilities' retention of Reliant, and Reliant's hiring of ProTherapy employees all occurred in quick succession, and are properly viewed as constituent parts of a coherent course of action. It is therefore inappropriate to consider the effect of the termination of the Agreements on Plaintiff's interest in the Facilities.

2.

In addition, the restrictive covenant was reasonably necessary to protect ProTherapy's legitimate business interest in "[e]xtraordinary or specialized training." Fla. Stat. §§ 542.335(1)(b)(5). "In order for training to be a protectable business interest, it must [exceed] . . . 'what is usual, regular, common, or customary in the industry in which the employee is employed.'" *Dyer v. Pioneer Concepts, Inc.*, 667 So. 2d 961, 964 (Fla. Dist. Ct. App. 1996), (quoting *Hapney v. Cent. Garage, Inc.*, 579 So. 2d 127, 132 (Fla. Dist. Ct. App. 1991)). "The precise degree of training or education . . . will vary from industry to industry and is a factual determination to be made by the trial court." *Hapney*, 579 So. 2d at 132. In any event, "skills which may be acquired by following the directions in the box or learned by a person or ordinary education by reading a manual do not meet the test." *Id.* For instance, an employee's training in general management skills is not sufficient. *Dyer*, 667 So. 2d at 964.

Skilled nursing is a specialized and complex field. ProTherapy thus analogizes the case to *Aero Kool Corp. v. Oosthuizen*, 736 So. 2d 25, 25-26 (Fla. Dist. Ct. App. 1999) (finding a legitimate business interest where plaintiff "provided [its employee] with over 195 hours of specialized training . . . in repairing and overhauling aircraft components") and *Balasco v. Gulf Auto Holding, Inc.*, 707 So. 2d at 860 (Fla. Dist. Ct. App. 1998) (finding legitimate business interest where car dealer trained employees in dealer-specific sales technique). Defendants attempt to distinguish *Aero Kool* and *Balasco* because in those cases, "the training provided was essential to the performance of the employee's job; it was not mere administrative functions."

But the specialized training that ProTherapy provided its personnel should not be dismissed as mere generalized administrative training, and it is apparent that it was essential to their work. ProTherapy's typical new hires received thirty to forty five days of training, including direct instruction, observations, shadow visits, routine audits of documentation, and

10

multiple coaching sessions, followed by a ninety-day period of close monitoring. Personnel were trained to comply with the service documentation requirements of Medicare and Medicaid, and other payer sources. There is no dispute that these systems can be "highly complex and difficult to understand." ProTherapy also trained its personnel to evaluate new patients for creation of therapy treatment plans, and to effectively interact with practitioners of other disciplines in a skilled nursing facility. As noted, this included training in Defendants' "favored practices and procedures." It was apparently not the sort of training that could be gleaned from a manual. *Cf. Hapney*, 579 So. 2d at 132.

Additionally, there is no dispute that restrictive covenants are commonplace in the skilled nursing industry. In fact, Defendants' contract with Reliant contains such a covenant, which is longer in duration that the provision in issue here. Given the great expense associated with training qualified therapy personnel, especially in rural areas, it would be foolish for a company to incur those costs without securing some protection for its investment.

3.

Defendants raise the general contention that Plaintiff has no legitimate business interest to protect because ProTherapy essentially went out of business upon termination of the Agreements. Under Florida law, the court "*may* consider" whether the party seeking enforcement has discontinued operations, but "only if such discontinuance of business is not the result of a violation of the restriction." Fla. Stat. § 542.335(1)(g) (emphasis added). Because the termination of the Agreements had a direct connection with the exodus of employees from ProTherapy to Reliant, it would be inappropriate to consider Plaintiff's business failure under the

11

circumstances. Defendants switched to Reliant in part because of cost considerations,[4] and it is evident that Reliant could offer lower cost service at least in part because it could reap the benefits of ProTherapy's training. Moreover, Defendants knew, or should have known, that many ProTherapy employees would switch to Reliant upon termination of the Agreements. As the Facilities were ProTherapy's only clients, it would have been obvious to anybody paying attention that the termination of the relationship made ProTherapy a "sinking ship." It is not surprising that many employees faced with that situation sought work with Reliant, to remain in familiar offices, among familiar colleagues, with familiar client demands.

Defendants also raise the general contention that the restrictive covenant is unreasonable, since its scope is not limited to the provision of therapy services. As noted, the Agreements require the Facilities to refrain from "employ[ing] or us[ing] . . . any individual who was employed or utilized as a contractor by [ProTherapy] for the provision of [therapy] Services." Effectively, Defendants' position is that since the modifier, "for the provision of Services," applies only to the latter half of the clause, it prevents Defendants from hiring a former therapist to work in any capacity at the Facilities. But the modifier could also be read to apply to both halves of the clause, *i.e.*, so that the clause prohibits therapists from being employed as therapists. As a court must "construe a restrictive covenant in favor or providing reasonable protection to all legitimate business interests," Florida law favors this interpretation. Fla. Stat. § 542.335(1)(h).

Moreover, even accepting Defendants' reading, any overbreadth is illusory. Although the express terms of the provision could conceivably apply to the case where a former therapist was

---

[4] Tom Clarke, the President and Chief Executive Officer of each Facility, as well as of Kissito, informed ProTherapy's Patricia Wike that Defendants were switching to Reliant because of Reliant's promise of lower cost services. Moreover, in a letter to ProTherapy, Kissito's Mike Yates indicated that the "economics of our fee and staffing models," prompted the transition.

hired as a janitor, or CEO, this outcome is unlikely in the bulk of cases. In addition, as Defendants have failed to present evidence that it occurred here, they fail to meet their burden of showing any overbreadth. Fla. Stat. § 542.335(1)(c). In any event, the court must modify the provision to be inapplicable in such cases. Fla. Stat. § 542.335(1)(c).

For the foregoing reasons, I conclude that Plaintiff has successfully made a *prima facie* case that the restrictive covenant was reasonably necessary to protect its legitimate business interests, and that Defendants have not met their burden of showing that the provision was overbroad, overlong, or otherwise not reasonably necessary.[5]

### D.

Generally, contract damages are intended to restore the non-breaching party to its condition before the breach. As this principal is preserved even when the parties stipulate damages in advance, a liquidated damages provision is only enforceable if several conditions are met: first, "the damages consequent upon a breach must not be readily ascertainable" and second, "the sum stipulated to be forfeited must not be so grossly disproportionate to any damages that might reasonably be expected to follow from a breach as to show that the parties could have intended only to induce full performance, rather than to liquidate their damages." *Lefemine v. Baron*, 573 So. 2d 326, 328 (Fla. 1991). Finally, the liquidated damages must not appear to be unconscionable when viewed after the fact. *Hyman v. Cohen*, 73 So. 2d 393, 401 (Fla. 1954). As the Agreements explicitly acknowledge "that compensatory monetary damages resulting from a breach of this [restrictive covenant] would be difficult to prove," and there is no reason to conclude otherwise, the controversy surrounds whether the $570,000 remedy sought is unconscionable or "grossly disproportionate" to ProTherapy's reasonably anticipated damages.

---

[5] I note also that courts are required to consider the effects of enforcement of a restrictive covenant on the public health, safety, and welfare. Fla. Stat. § 542.335(1)(g). Although neither of the parties has presented argument on this issue, I see no reason to conclude that the effects would be damaging in this case.

13

The validity of a liquidated damages provision is a question of law, committed to the determination of the court. *Smith v. Newell*, 20 So. 249, 251 (Fla. 1896). Generally, where "there is nothing in the record . . . to show that the parties believed, at the time of entering into the agreement, that they were stipulating for the forfeiture of a sum out of all proportion to the damages which might reasonably be sustained," the provision should be enforced. *Hyman*, 73 So. 2d at 401. Otherwise, the court must "conclude that the provision was intended to impose a penalty for breach, held *in terrorem* over the promisor to deter him from breaking his promise." *MCA Television Ltd. v. Pub. Interest Corp.*, 171 F.3d 1265, 1271 (11th Cir. 1999) (quotations omitted). "[T]his use of liquidated damages clauses to compel compliance with contractual terms has long been rejected." *Humana Med. Plan, Inc. v. Jacobson*, 614 So. 2d 520, 521-22 (Fla. Dist. Ct. App. 1992). "[I]n doubtful cases, the tendency of the courts is to construe a provision . . . as a provision for a penalty . . . ." *Hyman*, 73 So. 2d at 402.

Defendants contend that the parties' failure to tailor the damages to the severity of the breach belies the punitive nature of the liquidated damages provision. The Agreements impose the same remedy whether Defendants actively engaged in solicitation, whether they were aware of Reliant's activities, or whether the covered employees worked for a minute or a year. However, as sophisticated commercial entities, Defendants could have taken steps to prevent Reliant from hiring prohibited employees. Thus, Defendants' complicity in the breach is nearly the same regardless of whether they solicited employees, or whether they merely turned a blind eye to Reliant's activities. Furthermore, companies do not generally hire employees for minutes or days at a time. That the Agreements do not contemplate such a contingency suggests that the parties never considered whether it would occur, not that they intended to use the liquidated damages provision as a penalty.

Furthermore, "[t]wo commercial entities, with no suggestion of an imbalance of bargaining power between them, should be free to fashion a transaction [that includes a liquidated damages provision]." *Hot Developers, Inc. v. Willow Lake Estates, Inc.*, 950 So. 2d 537, 540-41 (Fla. Dist. Ct. App. 2007). Defendants were experienced commercial parties, having operated in the skilled nursing industry for approximately twenty years, while ProTherapy was a relative newcomer to the industry. Moreover, Kissito's CEO had almost 30 years of experience when the Agreements were entered. In addition, it is clear that the parties negotiated the Agreements, including the specific provision in issue, at arm's length. *See United States ex rel. James B. Donaghey, Inc. v. Dick Corp.*, No. 3:08cv56, 2010 WL 4666747, at *4 n.14 (N.D. Fla. Nov. 9 2010). A redline version of one of the Agreements shows that Kissito bargained for the June 30, 2008 exemption to the restrictive covenant, which ProTherapy accepted. There is therefore no basis to conclude that the parties believed that they were stipulating to an unreasonable forfeiture. *Hyman*, 73 So. 2d at 401.

Moreover, the uncontested evidence shows that the replacement cost of employees in the skilled nursing industry may be in the thousands of dollars. ProTherapy's Patricia Wike testified, by affidavit, that new hires are typically paid individually negotiated signing bonuses, which may reach as high as $10,000, depending on the need, experience of the prospective employee, and location of the facility. Moreover, ProTherapy has introduced evidence that it actually paid several employees signing bonuses ranging from $6,000 to $8,000. Wike further testified that other costs associated with recruitment and training can reach as high as $10,000 to $12,000 per employee. Defendants have not contested any of this evidence. Although Defendants rightly point out that Plaintiff has not provided cost information tailored to each of the fifty-seven employees in issue, this is beside the point. As the Agreements are of general applicability, it is appropriate to consider the replacement costs of employees, in general. In

view of the above, I conclude that the $10,000 sum per employee was proportional to ProTherapy's reasonably anticipated damages.

Finally, the damages sought are not unconscionable. In determining unconscionability, courts consider "(1) [whether] the buyer's failure to fulfill the contract was due to any misfortune beyond his control and (2) [whether] the seller received a benefit, the retention of which was shocking to the conscience of the court." *Hot Developers*, 950 So. 2d at 541 (Fla. 4th Dist. Ct. App. 2007); (citing *Beatty v. Flannery*, 49 So. 2d 81, 82 (Fla.1950)). For reasons already discussed, Defendants' failure to comply with the Agreements was not beyond Defendants' control. Nor are the damages sought shocking to the conscience.

Generally, damages of up to 10% of the price are permissible. *See Hot Developers*, 950 So. 2d at 541-52 (collecting cases). However, damages approaching 50% of a contract price are generally considered unconscionable. *See McNorton v. Pan Am. Bank of Orlando*, 387 So. 2d 393, 397 (Fla. 5th Dist. Ct. App. 1985) ("retention of 50% of purchase price" by a vendee in default was "sufficiently shocking to state a cause of action."); *Berndt v. Bieberstein*, 465 So. 2d 1264, 1266 (Fla. 2d Dist. Ct. App. 1985) (disallowing as unconscionable liquidated damages of over 55% of the purchase price). Both of the parties attempt to adapt the facts to the favorable caselaw. ProTherapy contends:

> In seventeen months, ProTherapy's invoices to the Facility Defendants for services rendered totaled $5,880,394.62. From September 2008 until September 2009, the thirteen months in which ProTherapy serviced all nine Kissito facilities, ProTherapy's total monthly invoices for therapy services averaged $387,979.13. Extrapolated over the twenty four month term of the [Agreements], this number equates to $9,311,499.12. Therefore, the liquidated damages ProTherapy seeks represent only 6.1% of the total contract price.

But while each Agreement purports to establish a twenty-four-month term, either party could terminate the Agreement, for any reason, on ninety days' notice. Thus, according to Defendants, the total contract price should be viewed as at most $1.15 million, for ninety days of service,

16

making the sought after damages equivalent to about half of the contract price. Relying on *Dade National Development Corp. v. Southeast Investments of Palm Beach County, Inc.*, 471 So. 2d 113 (Fla. Dist. Ct. App. 1985), ProTherapy responds that the cancellation provision is immaterial. However, unlike the instant case, *Dade National* concerned the purchase of real property for a fixed price, which would not fluctuate over time.

I am unaware of any case that confronts the precise issue here, where the value of the contract is proportional to its duration, and the parties may cancel at any time. However, I nonetheless conclude that damages in this case do not shock the conscience. The damages for each breach are only $10,000, which is a modest sum compared to Plaintiff's average monthly bill. Moreover, even the total damages are equivalent to only one and a half months of receipts, for a set of Agreements that contemplated (although did not require) performance over many months. Furthermore, courts must generally find that a contract is both procedurally and substantively unconscionable to conclude that it is unenforceable.[6] *Powertel, Inc. v. Bexley*, 743 So. 2d 570, 574 (Fla. Dist. Ct. App. 1999). "The procedural component relates to the manner in which the contract was entered and it involves consideration of such issues as the relative bargaining power of the parties and their ability to know and understand the disputed contract terms." *Powertel*, 743 So. 2d at 574. For reasons already discussed, Defendants could not prevail on a claim of procedural unconscionability. Accordingly, the liquidated damages provision is enforceable.

---

[6] Although I am unaware of any cases discussing procedural unconscionability in the liquidated damages context, I see no reason to ignore general principles of contract law.

## III.

For the foregoing reasons, I will grant Defendants' motion as it pertains to Kissito, and deny it as it pertains to the Facilities. In addition, I will grant Plaintiff's motion to the extent it seeks to hold the Facilities liable. However, as neither party has addressed why, or whether joint and several liability is appropriate, I will order the parties to provide further briefing on the issue before I enter an award.

The clerk of the court is directed to send a certified copy of this opinion to all counsel of record.

Entered this 3rd day of May, 2011.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE